**Linda L. HARRELL, Individually, as Personal Representative, and as Surviving Spouse of Larry Gene Harrell, Deceased, Plaintiff–Appellant,**

v.

**DECATUR COUNTY, GA., et al., Defendants–Appellees.**

Nos. 93–8905, 93–9165.

United States Court of Appeals, Eleventh Circuit.

June 22, 1994.

Nick M. Bajalia, Valdosta, GA, Charles A. Mathis, Jr., D. James Jordan, Milledgeville, GA, for appellant.

George M. Peagler, Jr., Ellis & Easterlin, Americus, GA, William C. Sanders, Alexander & Vann, Thomasville, GA, for appellees.

Before HATCHETT and DUBINA, Circuit Judges, and ESCHBACH*, Senior Circuit Judge.

HATCHETT, Circuit Judge:

Appellant, Linda Harrell, sued appellees, various Decatur County officials, following the shooting death of her husband. Harrell appeals the district court's order granting summary judgment in favor of all appellees. Because genuine issues of material fact exist concerning the circumstances of her husband's death, we reverse the district court's ruling and remand this case for proceedings consistent with this opinion.

## I. FACTS

On the evening of October 27, 1990, Decatur County Sheriff's Department Deputy Bob Morris took Annie Jefferson into custody following a domestic disturbance. While transporting Jefferson to the Decatur County Sheriff's Office, Morris observed an automobile, weaving back and forth across the center line of the highway. After calling the dispatcher, Morris turned on the blue lights of his squad car and the driver, Larry Harrell, pulled his automobile off the highway. After Harrell stopped his automobile, Deputy Morris asked him for his driver's license. During the ensuing conversation, Morris smelled alcohol in the vehicle and asked Harrell whether he had been drinking. Harrell replied, "I drank two or three beers."

Based on Harrell's reply, Morris directed him to leave the automobile to take a field sobriety test. Utilizing a device called an Alcansensor, Morris determined that Harrell was legally intoxicated under Georgia law, and arrested him for driving under the influence. Morris then conducted a pat-down search and placed a handcuff on Harrell's left wrist. As Morris attempted to place the other portion of the handcuff on Harrell's right wrist, Harrell attacked Morris. Morris fought back using his flashlight. As the altercation continued, the two men fell to the ground and rolled down an embankment into a ditch. In the ditch, Harrell took Morris's flashlight and hit him with it several times.

Before leaving the ditch, Harrell searched for Morris's revolver, asking him, "[w]here's your gun?" Although his service revolver was hidden in the small of his back, Morris told Harrell that the revolver was on the hill. When Harrell stood up to leave, Morris attempted to follow him, whereupon Harrell kicked him to the ground, threatening to kill him. Harrell then went up the embankment and entered his automobile from the driver's side. Moments later Morris climbed part way up the embankment and began shooting at Harrell through the passenger side of the automobile. Morris fired five shots, striking Harrell three times. Harrell died as a result of the gunshot wounds.

From the back seat of the squad car, Annie Jefferson observed the events leading to Harrell's death. Following the incident, Jefferson gave a statement to the investigator, in which she recalled that immediately after the fight Morris drew his weapon, walked part way up the embankment and shouted, "[h]old it, stop, stop." After hearing Morris shout, Jefferson observed him shoot his re-

tion.

* Honorable Jesse E. Eschbach, Senior U.S. Circuit Judge for the Seventh Circuit, sitting by designa-

volver into the passenger side of Harrell's automobile. She stated that after being shot, Harrell "fell over towards the passenger side of his car." In a deposition given pursuant to this lawsuit, Morris testified that as he approached the automobile, he saw Harrell bent over reaching for something under the passenger seat of the automobile. Morris, however, did not remember giving Harrell any verbal commands and admitted that he never saw a weapon in Harrell's hand or anything resembling a weapon in the automobile.

At the time Morris killed Harrell, the Decatur County Sheriff's Department's Standard Operating Procedure Manual contained the following provision regarding the use of weapons:

10. *Weapons Safety and Use.* No deputy shall draw his revolver from its holster unless under the following circumstances:

a. In participation of self-defense or in defense of another.

b. *To stop a known fleeing felon who refuses to stop on verbal command.*

c. On the pistol range during scheduled practice.

. . . . (Emphasis added.)

This policy, adopted in 1980, authorized a deputy sheriff to use deadly force to stop a fleeing felon after the giving of a verbal command. This policy was in effect when Morris killed Harrell. The policy predated the Supreme Court's decision in *Tennessee v. Garner,* 471 U.S. 1, 105 S.Ct. 1694, 85 L.Ed.2d 1 (1985), which limited the use of deadly force to stop fleeing felons. .

During his deposition, Decatur County Sheriff E.W. Phillips stated that he retracted the pre-*Garner* policy contained in provision 10(b), through verbal instructions to the deputies. Phillips, however, could not recall when he gave the verbal instructions or which deputies were present. During his deposition, Deputy Morris testified that although he did not recall receiving a verbal instruction from Sheriff Phillips or other supervisory officers in the department retracting the policy, he knew he could not use deadly force to stop a fleeing felon because

he had taken a mandatory state training course covering that topic in July, 1990.

## II. PROCEDURAL HISTORY

On October 25, 1991, Linda Harrell, Larry Harrell's spouse, filed a ten count complaint under 42 U.S.C. §§ 1983, 1985, 1986, and 1988 against Morris, Phillips, Decatur County, and members of the Board of County Commissioners, in their individual and official capacities. In her complaint, Harrell sought compensatory and punitive damages for violations of rights secured under the First, Fourth, Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution, and the laws and Constitution of Georgia.

Following discovery, Phillips and Morris filed motions for summary judgment asserting they were entitled to qualified immunity, in their individual and official capacities, against all claims. Decatur County and the commissioners also moved for summary judgment, asserting that under the facts of this case, no municipal liability arises under 42 U.S.C. § 1983. In summary orders issued June 11, 1993, the district court granted summary judgment in favor of all the appellees, and dismissed Harrell's claims. She appeals.

## III. CONTENTIONS OF THE PARTIES

Linda Harrell contends that the district court erred in granting summary judgment in favor of Morris and Phillips based on qualified immunity because genuine issues of material fact exist that a jury must resolve. Morris and Phillips contend that the essential facts are not in dispute and that Morris acted reasonably in shooting Harrell because Morris was defending himself. Linda Harrell also contends that the district court erred in granting summary judgment for Morris and Phillips, in their official capacity, because qualified immunity does not apply to official capacity claims. Morris and Phillips contend that they are entitled to qualified immunity in their official capacity because Harrell fails to show that a constitutionally deficient policy or custom played a role in Larry Harrell's death.

Linda Harrell also contends that municipal liability exists against Decatur County and the County Commissioners because inadequate training policies and supervision were the moving forces behind the constitutional violations. The County contends that it is not liable because Harrell fails to demonstrate that the alleged constitutional violations arose from a County policy or the County's failure to supervise the Decatur County Sheriff's Department.

Finally, Harrell contends that the district court erred in dismissing her pendent state claim for nuisance because she stated facts sufficient to withstand a motion for summary judgment. The appellants disagree and assert that Harrell's nuisance claim, like her remaining federal and state claims, does not state a basis for relief on the facts of this case.

## IV. ISSUES

The issues we determine on this appeal are whether the district court erred: (1) in granting summary judgment for Phillips and Morris, individually and in their official capacities based on qualified immunity; (2) in granting summary judgment for Decatur County and the Decatur Board of Commissioners, individually and in their official capacities; and (3) in dismissing Linda Harrell's remaining constitutional and pendent state claims.

## V. DISCUSSION

### A. Qualified Immunity

The district court granted summary judgment for Phillips and Morris, in their individual capacities, after determining that they were entitled to qualified immunity. That ruling raises a question of law we review *de novo*, viewing the facts drawn from the pleadings, affidavits and depositions, in the light most favorable to the appellant. *Hardin v. Hayes*, 957 F.2d 845, 848 (11th Cir. 1992); *Swint v. City of Wadley*, 5 F.3d 1435, 1439 (11th Cir.1993), *modified*, 11 F.3d 1030 (11th Cir.1994), *petition for cert. filed*, 62 U.S.L.W. 3707 (U.S. April 18, 1994) (No. 93–1638). On appeal, we must affirm the district court's ruling if the public officials es-tablish that they are entitled to qualified immunity and no genuine issues of material fact are disputed. *Rich v. Dollar*, 841 F.2d 1558, 1562 (11th Cir.1988).

Generally, qualified immunity shields public officials performing discretionary functions from civil liability if "their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982). Once public officials prove that they are acting within the scope of their discretionary authority when the allegedly wrongful acts occurred, the burden shifts to the claimant to demonstrate that the public official being sued violated a clearly established right. *Swint*, 5 F.3d at 1442. A right is clearly established if its contours are:

> sufficiently clear that a reasonable official would understand that what he is doing violates that right. This is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful, but it is to say that in the light of preexisting law, the unlawfulness must be apparent.

*Anderson v. Creighton*, 483 U.S. 635, 640, 107 S.Ct. 3034, 3039, 97 L.Ed.2d 523 (1987). Thus, if the law was clearly established, the qualified immunity privilege "ordinarily should fail, because a reasonably competent public official should know the law governing his conduct." *Harlow*, 457 U.S. at 818–19, 102 S.Ct. at 2738. Likewise, where genuine issues of material fact exist as to whether the public official actually engaged in conduct that violated clearly established law, summary judgment is inappropriate. *Rich*, 841 F.2d at 1563 (citing *Mitchell v. Forsyth*, 472 U.S. 511, 526, 105 S.Ct. 2806, 2815, 86 L.Ed.2d 411 (1985)).

Applying these principles to the facts of this case, we begin our inquiry with a review of the applicable law regarding police officers' use of excessive force. In 1985, the Supreme Court rendered its decision in *Tennessee v. Garner*, 471 U.S. 1, 11, 105 S.Ct. 1694, 1701, 85 L.Ed.2d 1 (1985), the seminal case governing the use of force in apprehend-

ing fleeing felons. In *Garner,* a police officer shot an unarmed juvenile, suspected of burglary, to prevent his escape. In considering the constitutionality of a Tennessee statute permitting the use of all necessary means to effect an arrest of a fleeing felon, the Supreme Court concluded that "there can be no question that apprehension by the use of deadly force is a seizure subject to the reasonableness requirement of the Fourth Amendment." *Garner,* 471 U.S. at 7, 105 S.Ct. at 1699. Then, balancing the state's interest in apprehending suspected felons against the rights of citizens to be free from unreasonable seizures, the Court held:

> [t]he use of deadly force to prevent the escape of all felony suspects, whatever the circumstances, is constitutionally unreasonable. It is not better that all felony suspects die than that they escape. *Where the suspect poses no immediate threat to the officer and no threat to others, the harm resulting from failing to apprehend him does not justify the use of deadly force to do so.* It is no doubt unfortunate when a suspect who is in sight escapes, but the fact that the police arrive a little late or are a little slower afoot does not always justify killing the suspect. A police officer may not seize an unarmed, nondangerous suspect by shooting him dead.

*Garner,* 471 U.S. at 11, 105 S.Ct. at 1701 (emphasis added).

■ In explicit terms, *Garner* stakes out the bright line necessary for determining whether public officials who shoot a fleeing felon are entitled to qualified immunity. *Post v. City of Fort Lauderdale,* 7 F.3d 1552, 1557 (1993), *modified,* 14 F.3d 583 (11th Cir. 1994). Because the Supreme Court issued *Garner* some five years prior to the events in question here, and its holding unequivocally prohibits the use of deadly force to apprehend a fleeing felon, it is axiomatic that at the time Morris killed Harrell the law was clearly established.

Morris and Phillips do not dispute the fact that at the time of Larry Harrell's death, clearly established law prohibited the use of deadly force to apprehend a fleeing felon. Likewise, Linda Harrell concedes that deputy Morris was acting within the scope of his discretionary authority when he attempted to arrest her husband following a routine traffic stop. *See Rich,* 841 F.2d at 1564 (police officer may take all reasonable actions pursuant to the performance of his duties and within the scope of his authority). Because the parties do not contest the legal paradigm underlying the application of qualified immunity, the only remaining issue is whether Linda Harrell has introduced evidence sufficient to create a genuine issue of material fact as to whether the appellants violated her husband's rights under *Garner. Hardin,* 957 F.2d at 849.

### 1. Deputy Morris

The focus of our inquiry into deputy Morris's assertion of qualified immunity is whether his actions violated clearly established law. *Rich,* 841 F.2d at 1564. To answer this question we consider the facts drawn from the pleadings, affidavits and depositions, in the light most favorable to Harrell. *Hardin,* 957 F.2d at 848. After considering the facts, we conclude that genuine issues of material facts are in dispute; consequently, qualified immunity is not appropriate. *Rich,* 841 F.2d at 1562.

In her complaint, Linda Harrell alleged that at the time Morris killed her husband, he was a fleeing felon with a constitutional right to be free from the use of deadly force. She further alleged that because her husband was a fleeing felon, Morris's use of deadly force was unreasonable and a violation of her husband's constitutional rights. Finally, she contends that because her husband was fleeing from the scene of the fight, he posed no threat to Morris.

In contrast, Morris maintains that he acted reasonably under the circumstances because at the time he fired his gun, Harrell appeared to be reaching for a weapon under the seat on the passenger side of the automobile.

■ Although the parties agree on most of the circumstances surrounding Harrell's death, at least one material fact remains in dispute: what Larry Harrell was doing in his

automobile at the time Morris shot him.[1] Morris contends that as he neared the top of the embankment he "saw Harrell on the driver's seat of [Harrell's] automobile ... bent over and appeared to ... be reaching for something under his seat on the passenger side of the car." Although Morris claims that he believed Harrell was reaching for a gun, he admitted that he did not see a weapon in Harrell's possession. Likewise, no weapon was found in Harrell's car.

Morris's recollection sharply conflicts with the account of eye-witness Annie Jefferson, who provided a written statement of the events in question pursuant to the investigation. In contradicting Morris's recollection, Jefferson did not recall seeing Harrell lean over into the passenger side of his automobile. To the contrary, Jefferson stated: "The deputy ... shot more than once. I saw Larry [Harrell] fall over toward the passenger side of his car. The deputy was shooting through the passenger side of Larry's car."

If Harrell was reaching under his seat, as Morris contends, Morris's conduct may have been reasonable under the circumstances because he may have reasonably believed that Harrell was searching for a weapon. *Anderson*, 483 U.S. at 641, 107 S.Ct. at 3039–40. In such circumstances, Morris may have properly acted in self defense. If, however, Harrell was not reaching under the seat, as Jefferson suggests, but was sitting in the driver's side of his automobile, Morris lacked the asserted basis for believing his life was being threatened, and Morris's sole justification for self-defense disappears. Absent a basis for believing his life or Jefferson's life was in danger, Morris had no reason to shoot at Harrell. Thus, the factual dispute of whether Harrell was leaning over towards the passenger seat of the automobile or simply sitting in the driver's seat must be resolved before a determination can be made

regarding the application of clearly established law.

Because the dispute over Harrell's position in his automobile prior to his death presents a genuine issue of material fact for a factfinder, we reverse the district court's order granting summary judgment for Morris on the basis of qualified immunity. *Hardin*, 957 F.2d at 849; *see McKinney v. Dekalb County*, 997 F.2d 1440, 1443 (11th Cir.1993) (summary judgment improper based on qualified immunity where parties dispute facts as to what transpired that leads police officer to shoot victim); *Sammons v. Taylor*, 967 F.2d 1533, 1539 (11th Cir.1992).

### 2. Sheriff Phillips

Harrell next challenges the district court's determination that Sheriff Phillips was entitled to qualified immunity in his individual capacity, contending that Phillips is liable because he was responsible for the supervision and implementation of an unconstitutional policy. Phillips disagrees and contends that he is entitled to qualified immunity because Harrell's "claim against him is a purely derivative one," and that "there can be no claim against [him] based on a theory of respondeat superior."

Although Phillips correctly notes that supervisors "cannot be held liable for the acts of employees solely on the basis of *respondeat superior*," *Fundiller v. City of Cooper City*, 777 F.2d 1436, 1443 (11th Cir.1985), "personal participation is not the *sine qua non*" for a supervisor to be held liable under § 1983. *Swint*, 5 F.3d at 1446. Rather, "[p]ersonal participation ... is only one of several ways to establish the requisite causal connection." *Swint*, 5 F.3d at 1446 (quoting *Zatler v. Wainwright*, 802 F.2d 397, 401 (11th Cir.1986). The inquiry into causation is a directed one which focuses on the particular duties and responsibilities of the individu-

---

1. Although not critical to our inquiry, the parties also dispute several collateral facts which pertain to the reasonableness of deputy Morris's perception that his life was in danger. Some of these factual disputes include: (1) whether Harrell closed the driver's side door after entering the vehicle; (2) whether Morris shouted "[h]old it, stop, stop!" before shooting Harrell; (3) the significance of such a command if made; and (4)

whether, under the circumstances, Morris could have employed less extreme methods to apprehend Harrell. These disputes raise further doubt as to the propriety of the district court's decision, but because the dispute over Harrell's position in the car prior to his death presents a genuine issue of material fact, we need not address these issues.

al appellees whose acts or omissions are the alleged cause of the constitutional violation, and liability may be imposed due to an improper policy or from the absence of a policy. *See Swint,* 5 F.3d at 1446; *Monell v. Dep't of Social Services,* 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978) (liability may be predicated upon a showing that an employee's action implements a policy the body's officers officially adopted and promulgated). *See also Post,* 7 F.3d at 1560–61; *Rivas v. Freeman,* 940 F.2d 1491, 1495 (11th Cir.1991); *Brown v. Crawford,* 906 F.2d 667, 671 (11th Cir.1990), *cert. denied,* 500 U.S. 933, 111 S.Ct. 2056, 114 L.Ed.2d 461 (1991); *Fundiller,* 777 F.2d at 1443.

In her complaint and subsequent pleadings, Harrell has alleged that Sheriff Phillips maintained a policy authorizing the use of unreasonable force to apprehend criminal suspects, and that as the elected sheriff of Decatur County, Phillips "had the authority to make policy decisions and to decide what policies were applicable to his deputies." She further contends that evidence in the record supports the inference that deputy Morris used unreasonable force in this case pursuant to a particular departmental policy.

The policy at issue appears in the department's Standard Operating Manual, provided to each deputy in the department. Adopted in March, 1980, five years prior to the Supreme Court's decision in *Tennessee v. Garner,* the policy permits deputies to use their weapons, "[t]o stop a known fleeing felon who refuses to stop on verbal command." Because the policy permits deputies to use their weapons to stop a fleeing felon, it violates clearly established law. *Garner,* 471 U.S. at 11, 105 S.Ct. at 1701 ("[t]he use of deadly force to prevent the escape of all felony suspects, whatever the circumstances, is constitutionally unreasonable"). Phillips, who has been Sheriff of Decatur County since approximately 1969, was responsible for the adoption and promulgation of the pre-*Garner* policy. He is also responsible for revising outdated departmental policies.

Phillips concedes that the 1980 policy violates *Garner* and that as Sheriff it was his responsibility to correct the policy in light of *Garner.* He claims, however, that even though he never formally amended the written policy, he verbally instructed the deputies that they could no longer use deadly force to apprehend fleeing felons. Phillips does not remember instructing deputy Morris of the change in the policy, and Morris does not remember receiving such a verbal instruction from Phillips. Even so, Morris maintains that he knew deadly force could only be used in self-defense or in the defense of others because he had previously enrolled in a mandatory training course where the change in the law was discussed.

■ Harrell's allegations and the facts surrounding her husband's death permit the reasonable inference that deputy Morris used deadly force against her husband pursuant to a pre-*Garner* policy Sheriff Phillips promulgated and maintained. Whether Morris actually acted pursuant to the pre-*Garner* policy when he shot Harrell, however, is a disputed question of material fact that cannot be answered without resolving the factual disputes surrounding Harrell's death or evaluating the credibility of the parties' witnesses. Because a genuine issue of material fact exists as to Harrell's claims against Sheriff Phillips, the district court erred in granting his motion for summary judgment based upon qualified immunity. *Fundiller,* 777 F.2d at 1443.

### B. Official Capacity

■ In granting summary judgment for deputy Morris and Sheriff Phillips, the district court apparently concluded that the doctrine of qualified immunity protected them from liability in both their individual and official capacities. That conclusion is wrong. It is well-settled that qualified immunity only protects public officials from lawsuits brought against them in their individual capacity. *Rivas,* 940 F.2d at 1494–95 (citing *Harlow,* 457 U.S. at 815, 102 S.Ct. at 2736–37). Because qualified immunity does not shield public officials from civil damages in their official capacities, the district court erred in granting summary judgment, based on qualified immunity, for Morris and Phillips in their official capacities. We therefore, reverse the district court order granting

summary judgment in favor of Morris and Phillips in their official capacities.

## C. Harrell's Claims against the County

In her complaint Harrell alleged claims against Decatur County and the Decatur County Commissioners, in their individual capacities. In moving for summary judgment, the County and the Commissioners asserted that: "[t]here is no genuine issue as to any material fact, and these defendants are entitled to judgment in their favor as a matter of law as to any alleged federal claims." In granting the motion, the district court stated:

> Upon a review of this matter the Court finds that while there is some controversy concerning some incidental details, there is no controversy concerning the facts which are material to a resolution of this matter and determines that the Defendant's motion for summary judgment and the motion to dismiss ... should be sustained for the reasons asserted in the motions and as elaborated in the brief filed in support thereof.

The district court provided no further analysis or explanation for its decision to grant summary judgment in favor of the County and the Commissioners.

As previously stated, the district court erred in granting summary judgment for Morris and Phillips because genuine issues of material fact exist which are necessary for the resolution of this dispute. Whether the district court's decision hinged upon a finding that Larry Harrell's constitutional rights were not violated or upon independent grounds is not apparent from its cursory opinion. The district court failed to discuss the extent of the County's involvement in the specific policies or departmental supervision which potentially led to Deputy Morris's actions. We, therefore, cannot conclude from the district court's opinion that the County was not sufficiently involved to relieve it from liability. Because we reject the district court's conclusion that no constitutional violation occurred and its order provides no further guidance for its decision, we reverse the order granting summary judgment with respect to the County and the County Commis-

sioners and remand this case for further proceedings consistent with this decision.

## D. Harrell's remaining claims

In granting summary judgment for all the appellees, the district court dismissed each of Harrell's claims. Thus, in addition to dismissing her claims under the Fourth and Fourteenth Amendment, the district court also dismissed Harrell's claims based on the First, Fifth, Sixth and Eighth amendments to the United States Constitution, and her pendent state claims for nuisance and negligence. After reviewing the record and applicable law, we conclude that Harrell's remaining constitutional claims and her pendent state law claims lack merit, and the district court properly dismissed them. In any event, Harrell failed to challenged the district court's dismissal of her constitutional claims and the state negligence claim on appeal, and we consider them abandoned. *American Key Corp. v. Cole Nat'l Corp.*, 762 F.2d 1569, 1579 (11th Cir.1985). *See also Harris v. Plastics Mfg. Co.*, 617 F.2d 438, 440 (5th Cir.1980) (failure to discuss an issue in argument portion of brief results in abandonment of issue on appeal).

## CONCLUSION

Based on the facts of this case, we hold that issues of material fact exist regarding the circumstances and cause of decedent Larry Harrell's death, and thus, the district court erred in granting summary judgment in favor of appellants, deputy Morris and Sheriff Phillips. Because genuine issues of material fact exist and the district court provided no analysis regarding its dismissal of the claims against the County appellees, we reverse its decision with respect to Decatur County and the County Commissioners and remand for proceedings consistent with this opinion.

REVERSED and REMANDED for further proceedings.

DUBINA, Circuit Judge, dissenting:

Because I am convinced that the majority has erred in its application of the doctrine of qualified immunity, I respectfully dissent.

Qualified immunity is *"immunity from suit rather than a mere defense to liability."* *Mitchell v. Forsyth,* 472 U.S. 511, 526, 105 S.Ct. 2806, 2815, 86 L.Ed.2d 411 (1985). The doctrine of qualified immunity is intended to protect government officials performing discretionary functions from the burdens of trial and broad-reaching discovery in cases that are insubstantial or that do not allege violations of clearly established law. *Id.* at 526, 105 S.Ct. at 2815; *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 2738–39, 73 L.Ed.2d 396 (1982). In particular, qualified immunity avoids "distraction of officials from their governmental duties, inhibition of discretionary action, and deterrence of able people from public service." *Harlow,* 457 U.S. at 816, 102 S.Ct. at 2737. *Accord Mitchell,* 472 U.S. at 526, 105 S.Ct. at 2815. These important purposes of qualified immunity are thwarted if a case is erroneously permitted to go to trial. *Mitchell,* 472 U.S. at 526, 105 S.Ct. at 2815. Police officers on the beat, who daily risk their lives to defend society and preserve our system of ordered liberty, are certainly among those government officers that qualified immunity is meant to protect. In my view, the case before us is precisely the type of case that qualified immunity is designed to resolve.

The applicability of qualified immunity is a question of law to be decided by the court. *Ansley v. Heinrich,* 925 F.2d 1339, 1341, 1345 (11th Cir.1991). To invoke the affirmative defense of qualified immunity, a defendant public official initially bears the burden of proving that he was acting within the scope of discretionary authority when the allegedly wrongful acts occurred. *Rich v. Dollar,* 841 F.2d 1558, 1563 (11th Cir.1988). Once the defendant public official satisfies this burden, the burden then shifts to the plaintiff to show that the actions of the defendant public official, at the time they occurred, violated clearly established law. *Id.* at 1564. The defendant public official is entitled to qualified immunity as a matter of law if either (1) the applicable law was not clearly established at the time of the alleged violation, *or* (2) the plaintiff fails to demonstrate the existence of genuine issues of material fact as to whether the defendant public official's actions violated the clearly-established law. *Mitchell,* 472

U.S. at 526, 105 S.Ct. at 2815; *Rich,* 841 F.2d at 1564.

There is no question that Deputy Morris was exercising his discretionary authority as a deputy sheriff when he shot Harrell. As discussed *infra,* it is also clear that the applicable law was clearly established at the time of the shooting. Thus, the pivotal question in this case is whether the plaintiff has successfully demonstrated any genuine issues of material fact as to whether Deputy Morris's actions violated the clearly established law.

In October of 1990, when the events involved in this case took place, the law governing the use of excessive force in the course of an arrest was clearly established. The Supreme Court had held that *"all* claims that law enforcement officers have used excessive force—deadly or not—in the course of an arrest, investigatory stop, or other 'seizure' of a free citizen should be analyzed under the Fourth Amendment and its 'reasonableness' standard." *Graham v. Connor,* 490 U.S. 386, 395, 109 S.Ct. 1865, 1867, 104 L.Ed.2d 443 (1989). "As in other Fourth Amendment contexts, however, the 'reasonableness' inquiry in an excessive force case is an objective one: the question is whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation." *Id.* at 397, 109 S.Ct. at 1872.

> The reasonableness of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight.... The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation.

*Id.* at 396–97, 109 S.Ct. at 1872. "[T]he question is 'whether the totality of the circumstances justifie[s] a particular sort of ... seizure.'" *Id.* at 396, 109 S.Ct. at 1872, *quoting Tennessee v. Garner,* 471 U.S. 1, 8–9, 105 S.Ct. 1694, 1700, 85 L.Ed.2d 1 (1985).

"Determining whether the force used to effect a particular seizure is 'reasonable' under the Fourth Amendment requires a careful balancing of 'the nature and quality of the intrusion on the individual's Fourth Amendment interests' against the countervailing governmental interests at stake." *Graham*, 490 U.S. at 396, 109 S.Ct. at 1871, *quoting Garner*, 471 U.S. at 8, 105 S.Ct. at 1699. The proper application of this balancing test will depend on such factors as "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting or attempting to evade arrest by flight." *Graham*, 490 U.S. at 396, 109 S.Ct. at 1872.

Thus, at the time of the events involved in this case, the law governing the use of deadly force during the course of an arrest was clearly established: use of deadly force during an arrest is constitutional if it strikes a balance between the competing interests of the individual and society that is objectively reasonable under the totality of the circumstances. Moreover, at the time of the events in this case, it was clearly established law that use of deadly force does strike such a balance when necessary as an act of self-defense or when necessary to stop a dangerous fleeing felon. *See O'Neal v. Dekalb County*, 850 F.2d 653, 657–658 & n. 7 (11th Cir.1988) (holding that where suspect armed with knife lunged at officer with knife, use of deadly force in self-defense did not violate Fourth Amendment); *Fraire v. City of Arlington*, 957 F.2d 1268, 1276–77 (5th Cir.), *cert. denied*, —— U.S. ——, 113 S.Ct. 462, 121 L.Ed.2d 371 (1992) (holding that where suspect was about to run over officer with his car, use of deadly force in self-defense was

constitutional); *Garner*, 471 U.S. at 11, 105 S.Ct. at 1701.

With regard to dangerous fleeing felons, the majority misapplies the clearly established law. Ever since the Supreme Court decided *Tennessee v. Garner* in 1985, the clearly established law governing the use of deadly force to seize a fleeing felon has been that

[w]here the officer has probable cause to believe that the suspect poses a threat of serious physical harm, either to the officer or to others, it is not constitutionally unreasonable to prevent escape by using deadly force. Thus, if the suspect threatens the officer with a weapon or there is probable cause to believe that he has committed a crime involving the infliction or threatened infliction of serious physical harm, deadly force may be used if necessary to prevent escape, and if, where feasible, some warning has been given.

*Garner*, 471 U.S. at 11–12, 105 S.Ct. at 1701. In my view, even if the majority were correct that a genuine issue of material fact exists as to whether or not Deputy Morris saw Harrell reaching for a weapon when he shot him, Deputy Morris's use of deadly force was constitutionally reasonable under the totality of the circumstances as a means of seizing a dangerous fleeing felon.

My review of the record persuades me that there are no genuine issues of material fact in this case. The majority's decision to reverse the district court's grant of summary judgment hinges entirely on its finding of one allegedly disputed fact—whether or not Harrell was reaching under the seat at the time Deputy Morris fired his weapon.[1] On this

---

1. In footnote one, the majority mentions several collateral fact questions, which it does not fully address but which it claims "raise further doubt as to the propriety of the district court's decision." In fact, none of these are genuine issues of material fact, and thus they have no bearing on the correctness of the district court's grant of summary judgment. Whether the driver's door was closed is not a material issue because even if it were, Deputy Morris's actions would have been constitutional.

There is no genuine issue with regard to whether Deputy Morris gave a warning. In her affidavit, eyewitness Annie Jefferson states that

she heard Deputy Morris shout "hold it, stop, stop." In his deposition, Deputy Morris stated that he could not recall whether he shouted a warning. Deputy Morris's inability to recall does not contradict or in any way impeach Annie Jefferson's undisputed testimony on this point. Furthermore, the significance of this warning is a legal not a factual question.

Finally, there are no material issues with regard to whether Deputy Morris could have used less extreme methods to apprehend Harrell. All the Constitution requires is that the force used be objectively reasonable, not that it be the absolute minimum necessary. *See O'Neal*, 850 F.2d at 656.

point, the majority has conjured a disputed issue of fact out of thin air. There is simply no evidence anywhere in the record that raises any genuine issue as to whether or not Harrell was reaching downward.

As discussed above, the burden was on Harrell to demonstrate genuine issues of material fact that would preclude summary judgment in favor of Deputy Morris on the basis of qualified immunity. Despite this heavy burden, the only evidence adduced by Harrell to dispute Deputy Morris's testimony that he thought Harrell was reaching for a weapon was the affidavit of Annie Jefferson, the only other eyewitness. Contrary to the majority's assertions that Jefferson's affidavit "sharply conflicts with" and "contradicts" Deputy Morris's testimony and that it "suggests" Harrell was not reaching, Jefferson's affidavit is, in fact, totally silent on the reaching issue. The only portions of Jefferson's affidavit that are even arguably relevant simply state that upon hearing the shots fired by Deputy Morris, "she saw Harrell fall over toward the passenger's side of his vehicle" and that "she observed Harrell fall over in the seat of his vehicle."

Even viewing the evidence in the light most favorable to Harrell and drawing all inferences in his favor, as we are duty bound to do when reviewing a grant of summary judgment, these two statements in Jefferson's affidavit do not raise any genuine issue of material fact as to whether or not a reasonable law enforcement officer in Deputy Morris's position and under similar circumstances would have thought that Harrell was reaching for a weapon. The only logical inference that can be drawn from Jefferson's statements is that at the time Harrell was shot, his body was in a position from which it was possible to fall into the passenger seat. Such an inference does not contradict Deputy Morris's testimony that Harrell's hands were reaching downward, much less raise a *genuine* issue of material fact. On the contrary, the arguable inference that Harrell was already leaning toward the passenger seat when he was shot actually supports rather than contradicts Deputy Morris's assertion that Harrell was reaching downward. Jefferson's affidavit cannot create a genuine issue of material fact on the reaching issue because it simply does not address it.

Moreover, it should be emphasized that even if Jefferson had disputed whether or not Harrell was reaching, her perspective is of limited relevance in that reasonableness is to be determined from the perspective of a reasonable officer under similar circumstances. Here, Jefferson's rear-angle view of events from the back seat of a patrol car and from behind a protective screen does not shed much light on what a reasonable officer standing in Deputy Morris's position just below the crest of an embankment and looking at a silhouette through the front passenger window would have seen at the moment Deputy Morris fired his weapon.

Given clearly established law and undisputed facts, the final question is whether as a matter of law Deputy Morris's use of deadly force struck a balance between the interests of Harrell and society that was objectively reasonable under the totality of the circumstances—that is, would a reasonable officer in Morris's position have thought deadly force was necessary either to rebuff an immediate threat to his life or to seize a dangerous fleeing felon.

Harrell's interest in his life, while undoubtedly great, is not absolute, for society has a countervailing interest in effective law enforcement and the protection of its citizens and law enforcement officers. "Policemen on the beat are exposed, in the service of society, to all the risks which the constant effort to prevent crime and apprehend criminals entails: Because these people are literally the foot soldiers of society's defense of ordered liberty, the State has an especial interest in their protection." *Roberts v. Louisiana*, 431 U.S. 633, 646–47, 97 S.Ct. 1993, 2000, 52 L.Ed.2d 637 (1977) (Rehnquist, J., dissenting). Effective law enforcement "requires the resort to deadly force, or at least the meaningful threat thereof." *Garner*, 471 U.S. at 9–10, 105 S.Ct. at 1700.

The undisputed facts confronting Deputy Morris at the time he fired the fatal shots were that Harrell was intoxicated, was resisting arrest, had beaten Deputy Morris with a flashlight so severely that the only other eyewitness feared Morris was dead, had

threatened to kill Deputy Morris and searched the latter's body for a gun with which to carry out the threat, had ignored Deputy Morris's warning to halt, and appeared to Deputy Morris to be reaching under the front seat of his car for a weapon. In view of these undisputed facts, Deputy Morris's use of deadly force as an act of self-defense struck a balance between Harrell's interest in avoiding seizure by deadly force and society's interest in protecting its law enforcement officers that was objectively reasonable. Under the totality of the circumstances, an objective officer in Deputy Morris's position could have reasonably believed that deadly force was necessary to protect his life. *See Young v. City of Killeen,* 775 F.2d 1349, 1352–53 (5th Cir.1985) (holding that use of deadly force was a constitutional act of self-defense where officer, who had just observed drug transaction and ordered driver of car to exit vehicle, thought driver was reaching down to seat or floorboard for a gun).

Even absent the element of self-defense, the use of deadly force to stop a dangerous fleeing felon would have been constitutional on these facts. If Harrell were merely a fleeing felon, the combined facts that he had been driving while intoxicated and had just committed a felony against a law enforcement officer that involved a significant threat of death or serious physical injury demonstrate that use of deadly force was constitutional under *Garner. See Fraire v. City of Arlington,* 957 F.2d at 1276 & n. 30 (holding

that suspect's conduct in drinking while driving, erratic driving, driving at high speeds through a residential neighborhood, and twice crashing his car indicated that suspect posed a threat of serious physical injury within the rationale of *Garner,* justifying the use of deadly force). Under these circumstances, the use of deadly force to seize a dangerous fleeing felon struck a balance between Harrell's Fourth Amendment interests and society's interests in effective law enforcement and protection of its citizenry that was objectively reasonable. Deputy Morris is entitled to qualified immunity. I would affirm the district court's grant of summary judgment in favor of Deputy Morris in his individual capacity.

Because Harrell was not deprived of any constitutional rights, it follows that the plaintiff's section 1983 claims against Deputy Morris in his official capacity, Sheriff Phillips in his individual and official capacities, Decatur County, and the Decatur County Commissioners cannot stand. *See* 42 U.S.C. § 1983. The district court's grant of summary judgment with respect to these claims should also be affirmed.